IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES LIMBAUGH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:93cv1404-WHA |
| | ) | (WO) |
| LESLIE THOMPSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| NATIVE AMERICAN PRISONERS | ) | |
| OF ALABAMA - TURTLE WIND | ) | |
| CLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:96cv554-WHA |
| | ) | |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants. | | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I. INTRODUCTION AND PROCEDURAL HISTORY

The plaintiffs in this case[1] are prisoners incarcerated in the Alabama Department of

---

[1]   The court consolidated this case with one initially filed in the Northern District of Alabama entitled, *Native American Prisoners of Alabama v. Alabama Department of Corrections*, 94-U-186-NE. *See* Docs. # 92 & 135.  The inmate organization which filed this lawsuit objected to the Alabama Department of Corrections ("ADOC's") refusal to provide them with a ceremonial ground, a sweat lodge, sacred plants, and other objects necessary to the practice of their Native American spirituality.

1

Corrections ("ADOC") who are adherents of Native American religion and are challenging,

pursuant to 42 U.S.C. § 1983, the ADOC's policies restricting inmate hair length.

This is not the first time these plaintiffs have been before this court. The plaintiffs

initially filed suit on November 24, 1993. An evidentiary hearing was held on February 9,

1998, and concluded on February 13, 1998. After the 1998 hearing, the parties announced

to the court that they had settled all issues except for the ban on sweat lodges and the

ADOC's hair length regulations. *See* Doc. # 193. On June 12, 2000, the court adopted the

Report and Recommendation of the Magistrate Judge and entered judgment in favor of the

defendants on the sweat lodge and hair length issues. *See* Doc. # 214. The plaintiffs

appealed this decision[2] to the Eleventh Circuit Court of Appeals. *See* Doc. # 218.

During the pendency of the appeal, Congress enacted the Religious Land Use and

Institutionalized Persons Act of 2000, ("RLUIPA"), 42 U.S.C. § 2000cc, et seq. Based on

the potential applicability of RLUIPA to this case, the Eleventh Circuit granted the plaintiffs'

motion to remand "to permit the district court to determine . . . whether the new federal

statute entitles plaintiffs to the relief that they seek." *See* Doc. 235.

The court allowed the plaintiffs to amend their complaint to add claims under

RLUIPA. *See* Doc. # 255. After a brief period of discovery, the defendants filed a motion

for summary judgment and supporting brief. *See* Docs. # 281 & 282. The parties also

stipulated that additional evidentiary hearings were not necessary. *Id*. The court then

---

[2] *See* the September 10, 1999 Recommendation of the Magistrate Judge (Doc. # 192) and the district court's June 12, 2000 order adopting the Magistrate Judge's Recommendation (Doc. # 214).

affirmed its conclusion that the ADOC's restriction on inmate hair length was the least restrictive means of furthering its compelling governmental interests in prison safety and security, and granted the defendants' motion for summary judgment on this issue. *See* Docs. # 309 and 317.

The plaintiffs again appealed this decision to the Eleventh Circuit Court of Appeals. *See* Doc. # 408. The Eleventh Circuit subsequently remanded this case for further development of the record.

> With regard to plaintiffs' hair-length-restriction claims, we conclude that on the present record factual issues exist as to whether, *inter alia*, the defendants' total ban on the wearing of long hair and denial of an exemption to the plaintiffs based on their Native American religion is "the least restrictive means of furthering [the defendants'] compelling governmental interest[s]" in security, discipline, hygiene and safety within the prisons and the public's safety in the event of escapes and alteration of appearances. *See* 42 U.S.C. § 2000cc-1(a)(2). In addition, we note that the evidentiary record relating to the hair-length claims is over ten years old and that, in the intervening time, prison staffing and administration, prison safety and security, and the prison population in Alabama have changed. We, thus, vacate and remand to the district court for a full evidentiary hearing and bench trial, following which the district court shall make detailed findings of fact and conclusions of law.

*Lathan v. Thompson*, 251 Fed. Appx. 665, 666 (11th Cir. 2007).[3]

---

[3] On April 21, 2011, the United States Supreme Court decided *Sossamon v. Texas* ___ U.S. ___, 131 S.Ct. 1651 (2011). On April 22, 2011, the court directed the parties to brief the effect, if any, *Sossamon, supra* has on the issues pending before the court. After careful review and consideration, the court concludes that *Sossamon, supra*, has no impact on the issues before the court. *Sossamon* concluded that States that accept federal funds do not waive their sovereign immunity for the purpose of monetary damages claims under RLUIPA, 565 U.S. at ___, 131 S.Ct. at 1655. Consequently, the defendants are immune from monetary damages in their official capacities.

More importantly, however, all of the plaintiffs' claims for monetary damages have previously been dismissed.

As to plaintiffs' claims for monetary relief, defendants are entitled to qualified immunity in their individual capacities because RLUIPA was not enacted until long after this lawsuit

The sole remaining issue before the court in this most recent chapter of this litigation is whether the ADOC's policies restricting inmate hair length pass muster under RLUIPA.[4] The defendants argue that the policies restricting hair length are in furtherance of and are the least restrictive means of furthering their compelling governmental interests in security, order, safety, and health.   The inmates argue that the record clearly supports the conclusion that the ADOC's policies are not the least restrictive means of furthering those compelling governmental interests.

After a lengthy evidentiary hearing and careful review of the briefs and evidence filed in support of and in opposition, the court concludes that the plaintiffs have made a prima facie showing that they are sincere adherents of Native American spirituality whose religious exercise has been substantially burdened by the ADOC's policies restricting inmate hair length.  The court further finds that the ADOC's restriction on inmate hair length is the least restrictive means of furthering its compelling governmental interests in prison safety and security.

---

began and the law with regard to Native American inmates' rights to hold sweat lodge ceremonies under RLUIPA or the Constitution was not clearly established at the time the sweat-lodge ban was implemented.  Furthermore, the defendants are entitled to sovereign immunity with regard to plaintiffs' official capacity claims.

*Lathan*, 251 Fed. Appx. at 666.  For the same reasons, the defendants are entitled to qualified immunity with regard to the plaintiffs' hair length claim.

[4] None of the plaintiffs' constitutional claims remain before the court.  Even if the constitutional claims remained, the plaintiffs would be entitled to no relief.  Because the regulations survive RLUIPA, they also survive a constitutional challenge.  "If a prison regulation passes muster under RLUIPA, however, it will perforce satisfy the requirements of the First Amendment, since RLUIPA offers greater protection to religious exercise than the First Amendment offers."  *Smith v. Allen*, 502 F.3d 1255, 1264 fn 5 (11th Cir. 2007).

## III. LEGAL STANDARDS

The substantive portions of RLUIPA provide that "[n]o government shall impose a substantial burden on the religious exercise" of prisoners unless the government can demonstrate that the burden both serves a compelling governmental interest and is the least restrictive means of advancing that interest.  42 U.S.C. § 2000cc-1(a).  *See also Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005).

> To establish a prima facie case under Section 3, a plaintiff must show: (1) that he engaged in a religious exercise, and (2) that the religious exercise was substantially burdened by a government practice. *See* [*Smith v. Allen*, 502 F.3d 1255], 1276 [(11th Cir. 2007)].  "The plaintiff bears the burden of persuasion on whether the government practice that is challenged by the claim substantially burdens the exercise of religion."  *See id*. (quotation marks, alteration, and ellipsis omitted). If the plaintiff establishes a prima facie case, the government must show that the challenged government practice is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  *Id*. (quoting 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b)).  Context matters in the application of the compelling governmental interest standard.  *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 2123, 161 L.Ed.2d 1020 (2005). The standard is applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.*

*Muhammad v. Sapp*, 388 Fed. Appx. 892, 895 (11th Cir. 2010).

The plaintiffs bear the initial burden of demonstrating that by maintaining and wearing their hair long, they are engaged in a religious exercise, and that the defendants' grooming policies substantially burden that exercise.  If the court determines that the challenged prison regulations substantially burden an inmate's religious expression, the burden then shifts to

5

the defendants to prove that the regulations further a compelling governmental interest.  *See* 42 U.S.C. § 2000cc-1(a)(1).   The defendants must first establish the existence of a compelling governmental interest.   The court then evaluates whether a defendant's policies satisfy RLUIPA's requirement that they be the least restrictive means of furthering that compelling governmental interest.  *See* 42 U.S.C. § 2000cc-1(a)(2).

Although the defendants bear the burden of proof on the compelling interests and the least restrictive means prongs of the Act, the law is well established that prison officials are entitled to deference on issues relating to good order, security and discipline.[5]

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.  Our decisions indicate that an accommodation must be measured so that it does not override significant interests. . . . While the Act adopts a "compelling governmental interest" standard, see *supra*, at 2118, "[c]ontext matters" in the application of that standards.  See *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325,

---

[5]  The standard of review of the defendants' regulations has evolved since the inception of this lawsuit. When the activities which ultimately resulted in the filing of this lawsuit occurred, the rational-basis test outlined in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987), was the indisputable standard for evaluating prison regulations which affected a prisoner's ability to freely practice his or her religion.  The *O'Lone* standard permits the promulgation of policies restricting a prisoner's free exercise of religion if the regulation is "reasonably related to legitimate penological interests."  482 U.S. at 349.

Shortly before this lawsuit was filed, Congress enacted the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et. seq*.  Congress' stated purpose in enacting this legislation was to create a more favorable standard of review for plaintiffs challenging policies burdening the free exercise of religion. Under the standard outlined in RFRA, prison officials could promulgate policies which substantially burden the free exercise of religion only if the regulation was "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Thereafter, the Supreme Court, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), declared RFRA unconstitutional and resurrected the rational basis test articulated in *O'Lone*.

Congress, in response, enacted RLUIPA and adopted the "compelling governmental interest and least restrictive means" standard emphasizing the need to "apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures, to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723.

156 L.Ed.2d 304 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, *e.g.,* 139 CONG. REC. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures, to maintain good order, security and discipline, consistent with consideration of costs and limited resources." JOINT STATEMENT 16699 (quoting S. REP. NO. 103-111, at 10, U.S. CODE CONG. & ADMIN. NEWS 1993, pp 1892, 1899, 1900).

*Cutter*, 544 U.S. at 722-23 (footnotes omitted) (alterations in original).

The court is mindful of its responsibility to avoid substituting its own judgment for that of prison administrators. It is not the court's duty to select on its own the least restrictive alternative but rather to defer, within reason, to the judgment of prison administrators. *DeMoss v. Crain*, 636 F.3d 145 (5th Cir. 2011). *See also Beard v. Banks*, 548 U.S. 521, 528 (2006) ("As *Overton* [*v. Bazzetta*, 539 U.S. 126 (2003)], . . . pointed out, courts owe "substantial deference to the professional judgment of prison administrators.")

## IV. DISCUSSION

### (1) Jurisdictional Requirement

One method of satisfying RLUIPA's jurisdictional requirement involves a determination of whether the allegedly substantially burdensome prison regulations are imposed in a "program or activity" which receives federal financial assistance.[6] *See* 42 U.S.C. § 2000cc-1(b)(1). The parties do not dispute that the ADOC receives a percentage of funding from the federal government for various programs and projects implemented in

---

[6] Because jurisdiction is established under 42 U.S.C. § 2000cc-1(b)(1), the court does not address the alternate method of establishing jurisdiction under 42 U.S.C. § 2000cc-1(b)(2).

the prison system.  Consequently, the court finds that the plaintiffs' claims fall within RLUIPA's jurisdictional ambit.

### (2) The Prima Facie Case

 **(a)  Religious exercise**.  The plaintiffs resist cutting their hair on religious grounds. Consequently, the plaintiffs are required to demonstrate that their preference for unshorn hair is a religious exercise of Native American spirituality which is substantially burdened by the ADOC's policies.  *See* 42 U.S.C. § 2000cc-2(b).  RLUIPA defines the term "religious exercise" as including "*any exercise of religion*, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A) (emphasis added).  *See also Smith v. Allen*, 502 F.3d 1255, 1276-77 (11th Cir. 2007) ("religious exercise" broadly defined).  In this case, the unrebutted testimony demonstrates, and the court finds, that a preference for unshorn hair is a central tenet of Native American spirituality and thus, satisfies the Act's broad definition of a religious exercise.  Relying on Deward Walker ("Walker"), the plaintiffs' proffered expert on Native American religious practices, the court finds that unshorn hair is of utmost importance to those adhering to a traditional Native American lifestyle.[7]  Plaintiffs Douglas Darkhorns Bailey and Michael Clem testified at the 2009 evidentiary hearing.  After careful consideration of their testimony, the court makes the

---

[7] Although Walker indicated that not all Native Americans wear their hair long, he also testified that "forcible cutting of a contemporary American Indian's hear would be about as severe a threat to the person as you can possibly imagine."  (Evid. Hrg. Tr., Jan. 21, 2009, R. 91).  The court finds that long hair has religious significance to American Indians and cutting that hair, as Walker testified, is "an assault on their sacredness."  (*Id*. at 92, 100).

following findings of fact.  Cutting of Native Americans' hair has spiritual and religious significance.  Prison regulations requiring short hair diminish the ability of the plaintiffs to approach their Creator with honor.[8]  Cutting their hair detracts from their abilities to practice their religion, because when their hair has been cut, they feel separated and disconnected spiritually during their religious ceremonies.  (Evid. Hr'g. Tr. at 9-11, 28).  For example, one plaintiff cut his hair very short as a sign of mourning when his mother died.  (*Id*. at 27).

The defendants do not challenge the centrality of these religious beliefs nor do they question the plaintiffs' sincerity.  Moreover, the record clearly supports, and the court finds, that unshorn hair cannot reasonably be interpreted as merely a preference which the plaintiffs have conveniently labeled as religious for purposes of this litigation.  Based on RLUIPA's expansive definition of religious exercise and the testimony in this case which establishes that the plaintiffs sincerely believe that unshorn hair is integral to the practice of their religion, the court concludes that the ADOC regulations at issue in this case affect the plaintiffs' exercise of religion.

**(b)  Substantial burden**.  The next question for the court is whether the prison regulations "substantially burden" the inmates' religious exercise.  In *Midrash Sephardi, Inc.*, the Eleventh Circuit explained that

> "substantial burden" requires something more than an incidental effect on religious exercise. . . . [A] "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to

---

[8]  *See* Evid. Hrg. Tr., Douglas Darkhorns Bailey, Jan. 21, 2009, R. 9-13; Evid. Hrg. Tr., Thomas Adams, Jan. 21, 2009, R. 45-47; Evid. Hrg. Tr.,  Franklin Running Bear Irvin, Jan. 21, 2009, R. 52-54.

significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.  Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004).  Stated another way, "the governmental action must significantly hamper one's religious practice." *Smith*, 502 F.3d at 1277.

The court finds that the involuntary cutting of the plaintiffs' hair substantially burdens the practice of their religious exercise.  (Evid. Hr'g Tr., Thomas Otter Adams, R. 46).  Plaintiff Adams described the cutting of his hair as "severely" impacting his ability to practice his religion.  (*Id*. at 47).

> ...[W]hen we set there in ceremony and our effort is to get a prayer through with a prayer pipe, all of our ceremonies are connected.  All way of living, our religion, beliefs that it's the circle.  If there is part of that missing, when we meet the Creator then we stand before Him with shame on our face.  I don't want to meet my Creator with that shame on my face.
>
> It's that way in the prisons.  I don't want to meet my Creator with that shame on my face.  That I haven't lived the truth.  That I haven't lived the traditional way of life.  I may never get out of prison again.  This is my only chance. . . . There are great consequences, eternal consequences,  Eternal consequences for not doing that.

(*Id*.)

Plaintiff Michael Clem testified that cutting his hair was a substantial burden on the practice of his religious exercise.

> Q:   And how serious a burden is it for you and your religious practices to have to cut your hair?
>
> A:   Well, I'm cutting off a part of myself.  I mean, the Creator, GOD, give

10

me the hair for me, to help in my spirituality.  It's part of my condition, not just with God, but with everything, all creation.  If I start cutting my hands off, my toes, my feet, the same with my hair.

Q:    But does your hair have – that has an additional significance, an additional spiritual religious significance to you, is that correct?

A:    Well, its hard to explain, actually, the symbolics of it, because like I said, it's like my energy source.  It's how I connect with everything. It's like if somebody asks me to do a sweat, I tell them I am not capable of doing it.  I mean, instead of doing a two hour ceremony I may do it fifteen minutes because I have so much negative, I have so much animosity.

(*Id*. at 29).

Plaintiff Franklin Running Bear Irvin testified that "the growing of our hair in the spiritual sense is a connection between us and Our Creator and the spirit world.  To sever that connection would hinder and burden because it would sever that spiritual connection, just like the cutting of Mother Earth's hair." (*Id*. at 53).  Thus, the court finds that cutting the hair of adherents of Native American religion substantially burdens the practice of their religious exercise.

The defendants argue that prison regulations restricting inmate hair length are not substantially burdensome because the ADOC permits Native American inmates to participate in a panoply of other religious practices.  In short, the ADOC argues that the substantial burden inquiry does not focus on a specific or isolated religious practice, like hair length, but on whether the plaintiffs' ability to *comprehensively practice* their Native American spirituality is substantially burdened.

As already noted, the court finds that long hair is a central tenet of Native American spirituality of which the plaintiffs are sincere adherents.  Additionally, the court finds that the ADOC's restrictive policies prevent the plaintiffs from exercising fundamental religious beliefs.  Accordingly, the court concludes that, as a matter of law, the ADOC's curtailment of these religious practices substantially burden the plaintiffs' Native American spirituality.

In reaching this conclusion, the court rejects the ADOC's position that the plaintiffs are not substantially burdened because prison officials allow them to exercise their Native American spirituality through other means.  This argument is based on an assumption that all aspects of Native American spirituality are interchangeable and of equal importance.  This assumption is clearly unsupported by the record, and contrary to the court's findings of fact. The ADOC's interpretation of the "substantial burden standard," which would permit prison officials with limited knowledge and familiarity with Native American spirituality to unilaterally determine the interchangeability of various religious practices despite expert testimony to the contrary, is inconsistent with RLUIPA's purpose of prohibiting frivolous or arbitrary rules restricting inmate religious practices.  *See* S. REP. NO. S7775 (July 27, 2000). The existence of alternate expressions of Native American spirituality does not obviate the centrality of the religious practices at issue in this case.  *Cf., Blanken v. Ohio Dep't of Rehab. & Corr.*, 944 F. Supp. 1359, 1365-1366 (S.D. Ohio 1996) (rejecting defendant's claim that plaintiff was not substantially burdened based on the availability of other religious practices).

Consequently, the court concludes that the plaintiffs have satisfied their prima facie

burden of demonstrating that the ADOC's regulations restricting hair length substantially burdens the practice of their Native American spirituality.

### 3. Application of the Compelling Interests and Least Restrictive Means Prongs

With the plaintiffs having established that the ADOC's policies substantially burden the plaintiffs' exercise of their religion, the burden now shifts to the defendants. They must prove that the grooming restrictions further a compelling governmental interest and that those restrictions are the least restrictive means of furthering those compelling interests. *See* 42 U.S.C. § 2000cc-1(a)(1)(2).

**a. Compelling Interests.** The ADOC identified several compelling interests that are furthered by enforcing hair length restrictions including security and order, discipline, safety, health, hygiene and sanitation, and prevention of the introduction of contraband.

In accordance with the Eleventh Circuit's remand, the court held an evidentiary hearing on January 21, 22 and 23, 2009.[9] Based on the testimony at the hearing and the evidence presented, the court makes the following findings of fact which establish the context for applying the laws. In September 2008, the jurisdiction population[10] of the ADOC

---

[9] At the conclusion of the hearing, the parties requested additional time to file post-hearing briefs. Thereafter, *Thunderhorse v. Pierce*, 364 Fed. Appx. 141 (5th Cir. 2010), a RLUIPA case involving forced hair cuts, was appealed to the United States Supreme Court. The case was held over and the Solicitor General's opinion was sought before *certiorari* was denied. ___ U.S. ___, 131 S.Ct. 896 (Jan. 10, 2011).

Also pending before the United States Supreme Court was *Sossamon v. Texas,* ___ U.S. ___, 130 S.Ct. 3319 (May 24, 2010). On April 21, 2011, the United States Supreme Court decided *Sossamon v. Texas,* concluding that States that accept federal funds do not waive their sovereign immunity for the purpose of monetary damages claims under RLUIPA, 565 U.S. ___, ___, 131 S.Ct. 1651, 1655 (2011).

[10] Jurisdictional population is defined as "all inmates serving time within ADOC facilities/programs, as well as in the custody of other correctional authorities, such as county jails, other State DOCs, Community

was 29,959 inmates.[11]  *See* Defs' Ex. 8.[12]  The ADOC houses 25,303 inmates.[13]  *Id*.  ADOC facilities are designed to hold 13,403 inmates.  (*Id*.).  Consequently, the number of inmates being housed by the ADOC exceeds the statewide design capacity by 188.8%.  At the end of 2007, "all correctional institutions housed nearly double the number of inmates that  the facilities were designed to hold."  (Defs' Ex. 9 at 19, Evid. Hr'g.).   The statewide overcrowding index was at 196.5%.  (*Id*.)  In addition, disciplinary actions increased by 62% in 2007; there were 18,226 disciplinaries issued that year.  (*Id*. at 20).

While the prisons remained overcrowded, the ADOC was also understaffed.  Although the ADOC added 440 correctional personnel during 2007, it also lost 332 officers.  (*Id*. at 33).  In 2007, the ADOC was authorized 3672 correctional officers but could only fill 2675 positions.  Consequently, the ADOC was operating at a shortfall of 997 correctional personnel which equates to a vacancy in one of every four positions.  (*Id*. at 34).

---

Correction Programs, Federal Prisons, and Privately Leased Facilities."  *See* Page 1, Alabama Department of Corrections, Monthly Report, Legend.

[11]  According to their website, the inmate population of the ADOC on June 15, 2011, was 28,043 male inmates and 2332 female inmates for a total of 30,375 inmates. (http://www.doc.state.al.us/inmsearch.asp).

[12]  Defendants' Exhibit 8 is the ADOC's September 2008 Monthly Statistical Report.  It was admitted into evidence at the hearing without objection.  The ADOC also publishes on its website current monthly reports. The February 2011 monthly report indicates a jurisdictional population of 31,885, with 26,628 inmates in custody and 25,320 inmates housed in ADOC facilities. (http://www.doc.state.al.us/docs/MonthlyRpts/2011-02.pdf)  A review of the monthly reports from 2009 until February 2011 demonstrate that the number of inmates housed by the ADOC has increased during that time period.  (http://www.doc.state.al.us/reports.asp)

[13]  Inmates housed by the ADOC are those inmates in custody and located within correctional facilities owned and operated by the ADOC.  *See* Page 1, Alabama Department of Corrections, Monthly Report, Legend.

14

Between 1997 and 2007, the inmate population of the ADOC increased by 23%; it added 6478 inmates.[14]  Except for the years 2000 and 2004, the number of admissions to the ADOC outpaced the number of releases by almost 5000 offenders.  (*Id*. at 35).  Finally, almost 50% of inmates were incarcerated for felonies against persons.  (*Id*.)

The law is well established that security, order, and discipline are compelling governmental interests.  *See Cutter*, 544 U.S. at 722-23 (security concerns constitute compelling governmental interests); *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) (security, order and rehabilitation are compelling governmental interests); *Johnson v. California*, 543 U.S. 499, 512 (2005) (prison security and discipline are compelling governmental interests).

The defendants first argue that the compelling governmental interest in security is furthered by being able to quickly and correctly identify inmates.  The hair length restrictions promote and are necessary to enable the defendants to maintain this security interest.  Based on the evidence presented, the court finds that long hair can be used by inmates to alter their appearance to prevent or hinder identification.[15]  Long hair impedes the ability of officers to

---

[14]  The only year the population of the ADOC did not increase was 2004, and the reason for that decrease was the convening of a second parole board charged with increasing the number of non-violent offenders on parole.  (Defs' Ex. 9, at 35, Evid. Hr'g).

[15]  The plaintiffs argued extensively that a less restrictive means of furthering the compelling governmental interest of identification would be through the purchase and use of the Photoshop computer program which allows a user to manipulate a digital photograph.  According to the plaintiffs, Photoshop would allow the ADOC to manipulate inmate photographs to predict any potential alteration to an inmate's appearance in the case of escape.  Beyond the practical matters of cost and training, the use of Photoshop does not alleviate the ADOC's compelling governmental interest in swift, accurate identification of inmates who are incarcerated.

quickly identify inmates moving through the prison yard, dining halls and dormitory areas. Officers are better able to correctly identify inmates when their hair is shorter.  (Evid. Hr'g Tr. at 61).  The need to identify inmates quickly and accurately is heightened when the prisons are operating with a shortage of correctional officers.  Additionally, the court finds that hair length can be used by inmates to identify with "special groups" including gangs. (*Id.* at 26).  The grooming policies enable prison administrators to reduce gang association by requiring all inmates to have short hair.  Thus, the court concludes that the defendants have demonstrated a compelling governmental interest in security[16] that is furthered by the accurate and swift identification of inmates.

The defendants also argue that preventing weapons and other contraband from entering the prisons promote the compelling governmental interests of security and order. The court finds that long hair can be used as a means of hiding weapons[17] or other contraband.  There is an increased likelihood that inmates with long hair could more easily

---

[16]  In *Cutter*, the Court found that preventing violence in prisons is a compelling governmental interest. 544 U.S. at 723, fn. 11.  Gang affiliations often result in violence. Thus, the hair length restrictions, which impede the inmates' abilities to associate with gangs, further the compelling governmental interest of preventing violence.

[17]During the evidentiary hearing, counsel for the plaintiffs brought out evidence that the hair length regulation was different for women prisoners than men.  The plaintiffs argue that sex based differential application of a hair length regulation demonstrates that any asserted security reason is false.  The plaintiffs ignore testimony presented during the hearing which shows that male prisoners constitute a greater threat than female prisoners.  Furthermore, the female inmate population is significantly lower than the male inmate population.  For example, the Julia Tutweiler Prison for Women housed 729 female inmates in 2007 while the majority of male inmate facilities each exceeded 1000 inmates.  (Defs' Ex. 8, Evid. Hr'g).

Both the Third and Sixth Circuits have concluded that differential hair length regulations in prisons are constitutionally permissible. *Dreibelbis v. Marks*, 742 F.2d 792, 795-96 (3rd Cir. 1984); *Pollock v. Marshall*, 845 F.2d 656, 659-60 (6th Cir. 1988).

16

conceal in their hair weapons including pieces of razors or wires, as well as other types of contraband. Requiring correctional officers to search long hair for contraband or weapons constitutes a safety and health hazard to the correctional officers. The court also finds that requiring inmates to search their own hair does not assuage this concern because an inmate secreting contraband in long hair can manipulate the search to avoid detection of the contraband. Long hair exacerbates the difficulty of and length of time necessary to search for contraband, which is of particular concern to the ADOC because of their reduced number of correctional officers. The court therefore concludes that the defendants have demonstrated that the compelling governmental interests in security and order are furthered by the hair length restrictions which prevent "the secreting of contraband or weapons in hair or beards." *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

Based on the record before the court, including the testimony of Gwendolyn Mosley, the Institutional Coordinator for the ADOC, Ronald Angelone, the defendants' expert witness, and Warden Culliver, the court finds that hair length restrictions further the compelling governmental interest in security by allowing the defendants to maintain control, order, and discipline in the prisons.

> Order is the fabric that any system runs by . . . The strands that bring it together are the policies and procedures that are put into place for safety, security and health reasons to be able to run that environment so that everyone, from every waking moment that an individual is living there or working there, they know exactly what to expect, and then they make their own individual decisions on how they are going to react to those policies and procedures. And by reacting correctly in a mature manner, whether its those living there or those working there, is able to provide an orderly system for people to exist in

17

a safe environment.

(*Id*. at 45).

The plaintiffs suggest in their brief that the defendants did not introduce evidence that security concerns support the hair length regulations. This suggestion is simply incorrect. The court finds that inmates today are "younger, bolder and meaner" and it is necessary to instill discipline and order to control these inmates because violence is prevalent in prisons. (Evid. Hr'g Tr. at 29). Furthermore, the court finds that long hair is a danger because it can be used in a fight. For example, an inmate could "grab a handful" of hair, pull and cause serious injury. (*Id*. at 69). Mosley testified that "long hair creates problems . . . [in] fights, [inmates] can pull the hair." (*Id*. at 27). Angelone testified that long hair is a safety and security concern during fights. (*Id.* at 52).

The court also finds that ADOC is presently understaffed and overcrowded.[18] Mosley testified that the ratio of correctional officers to inmates is presently 10 to 1. (*Id*. at 28). In light of staff shortfalls, the court finds that maintaining order and discipline in the prisons is critical to ensuring safety for staff and inmates.[19] Uniformity within the institutions also instills discipline and promotes order by exercising some control over the inmates. (*Id*. at 146, 148, 153, 158).

---

[18] Although the parties argued about the methodology and applicability of staffing studies, it was undisputed that Alabama prisons are overcrowded and understaffed.

[19] As previously noted, in 2007, the ADOC personnel had initiated 18,226 disciplinary actions against inmates.

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it *does not override* other significant interests.

*Cutter*, 544 U.S. 722 (emphasis added).

The court concludes therefore that the ADOC has demonstrated a compelling governmental interest in security and order that encompasses maintaining a safe and controlled environment.

The court also finds that the ADOC's grooming policies promote health, hygiene and sanitation which further compelling governmental interests in cost containment and health care costs which are a significant concern in the current economic environment.[20]   *See Muhammad*, 388 Fed. Appx. at 896-97. *See also DeMoss*, 636 F.3d at 153. The court finds that the hair length restrictions promote cleanliness and reduce health care costs. Angelone testified that inmates with long hair have found cysts and sores on their heads, and on at least one occasion, an inmate found a spider living in his hair. (*Id*. at 52). The court finds that short hair promotes health and hygiene by making it easier to detect infections and infestations as well as reduce the spread of infections and infestations. (*Id*. at 33). Reduced infections and infestations also reduce the ADOC's health care costs. Thus, the court

---

[20]   The court can take judicial notice of the current economic climate, including the budgetary woes of the State of Alabama. "A fact may be judicially noticed only if it is not subject to reasonable dispute, either because it is generally known within the district court's territorial jurisdiction or because it can be accurately and readily determined using sources whose accuracy cannot reasonably be questioned." *United States v. Gregory*, 2009 WL 205549, *2 (11th Cir. 2009). *See also* FED.R.EVID. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court. . .")

concludes that the hair length restrictions further the compelling governmental interests in cost containment and health care costs.

Clearly, Alabama has compelling governmental interests in security and safety in their correctional facilities. The grooming policies that restrict hair length further those interests by maintaining order and discipline, preventing violence, hindering the introduction of contraband into the prisons, and enabling the prompt and accurate identification of inmates. The hair length restrictions also promote the health, hygiene and sanitation of its inmates which reduces health care costs and furthers the defendants' compelling governmental interest in cost containment and reducing health care costs. These policies are especially compelling in the context of prisons which are overcrowded and understaffed. Thus, the court concludes that the ADOC has demonstrated compelling governmental interests in the areas of security and order, and cost containment and reduction of health care costs.

It may appear to some that it is ironic for the court to conclude that overcrowding in Alabama's prisons is in part a justification for holding that the plaintiffs' rights under RLUIPA may be curtailed. In other words, it is ironic that a constitutional violation can justify a statutory violation. But the irony would truly exist only if overcrowding alone were a constitutional violation. Plainly it is not. Overcrowding of prisons is not per se unconstitutional. *See Rhodes v. Chapman*, 452 U.S. 337, 347-50 (1981); *Collins v. Ainsworth*, 382 F.3d 529, 540 (5th Cir. 2004).

> Some conditions of confinement may establish an Eighth Amendment
> violation "in combination" when each would not do so alone, but only when

20

> they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise - for example, a low cell temperature at night combined with a failure to issue blankets.

*Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

*Brown v. Plata*, — U.S. —, 131 S.Ct. 1910 (2011), is not to the contrary. *Plata* cannot be read to hold that overcrowding alone is a violation of the Eighth Amendment. The three judge panel's order affirmed by the Court required a reduction in California's prison system's population to 137.5% of design capacity. Had the Court found overcrowding itself to be a Constitutional violation, it could not have approved a remedy that permitted continued overcrowding.

Rather, the Court found that medical and mental health care in California's prisons were Constitutionally inadequate and that efforts to remedy that violation were frustrated by overcrowding.

> Overcrowding has overtaken the limited resources of prison staff; imposed demands well beyond the capacity of medical and mental health facilities; and created unsanitary and unsafe conditions that make progress in the provision of care difficult or impossible to achieve. The overcrowding is the "primary cause of the violation of a Federal right," 18 U.S.C. § 3626(a)(3)(E)(I), specifically the severe and unlawful mistreatment of prisoners through grossly inadequate provision of medical and mental health care.

*Plata*, — U.S. —, 131 S.Ct. at 1923.

Indeed, *Plata's* litany of the ills suffered by California's prison system supports the court's conclusion in the instant case. The consequences of overcrowding in California's prisons include (1) increased, substantial risk for transmission of infectious illness, (2) a

suicide rate approaching an average of one per week, (3) failure to provide even minimal treatment to mentally ill inmates, and (4) severely deficient medical treatment for physical illnesses including the infliction of unnecessary pain.  *Plata* holds that overcrowding in California's prisons was the cause of these unconstitutional conditions and prevented implementing a remedy for them.  As the court has explained, the overcrowded and understaffed prisons in Alabama increase the difficulties prison guards face daily in controlling inmates and securing order within the prisons.  Adopting the plaintiffs' position could exacerbate the consequences of overcrowding by placing increased pressure on already strained security measures.  Congress through RLUIPA surely did not intend such a result.

      **b. Least restrictive means**.  Finally, the court concludes that the defendants have demonstrated that the grooming policies are the least restrictive means to further the compelling governmental interests in security and order and cost containment and reduction in health care costs.  Courts have consistently held that prison grooming regulations restricting inmate hair length are the least restrictive means of advancing compelling governmental interests in maintaining prison security and order.  *See Brunskill v. Boy*, 141 Fed. Appx. 771 (11th Cir. 2005) (prison policies requiring plaintiff to cut hair did not violate RLUIPA); *Harris*, 97 F.3d at 504.  The hair length restrictions are the least restrictive means of maintaining uniformity, impressing order and discipline on prison inmates, preventing gang affiliation and reducing prison violence, hindering the introduction of contraband into the prisons, and enabling the prompt and accurate identification of inmates.  The hair length

restrictions are also the least restrictive means of promoting the health, hygiene and sanitation of its inmates and furthers the defendants' compelling governmental interest in cost containment and reducing health care costs.

More importantly, the court is bound by the Eleventh Circuit's holding in *Harris v. Chapman, supra*. *Harris* was decided under RFRA, but RLUIPA essentially adopts RFRA's compelling interest/least restrictive means standard, and the plaintiffs have not otherwise distinguished the facts of this case. The court is compelled to follow *Harris* and other cases applying RFRA to regulations as well as RLUIPA cases. In *Harris*, the court upheld the Florida Department of Corrections policy which mandated that all inmates have their hair cut short to medium length. *Id.* In explaining its reasoning, the court indicated "we are unable to suggest any lesser means than a hair length rule for satisfying these interests . . . . we thus join these courts in finding that a reasonable hair length regulation satisfies the least restrictive means test." *Harris*, 97 F.3d at 504.

In addition, *Harris's* holding is consistent with decisions of other courts which hold that prison grooming regulations restricting inmate hair length are the least restrictive means of advancing the substantial governmental interest in maintaining prison security and order. Almost every court[21] that has considered hair length restrictions have upheld prison hair

_____

[21] In *Warsoldier v. Woodford*, the Ninth Circuit held that the California Department of Corrections' grooming policy "intentionally puts significant pressure on such inmates as [the plaintiff] to abandon their religious beliefs by cutting their hair, [and thus,] . . . imposes a substantial burden on [the plaintiff's religious practice." 418 F.3d 989, 996 (9th Cir. 2005). This case is inapposite to the case at bar. The parties do not argue in the case before the court that the ADOC grooming policies pressure inmates to abandon their religious beliefs.

length restrictions as permissible under RLUIPA.  *See DeMoss*, *supra* (Texas state prison

grooming policies do not violate RLUIPA); *Thunderhorse*, *supra* (hair length policies were

least restrictive means of protecting State's compelling interest in maintaining security, and

thus, did not violate RLUIPA); *Williams v. Snyder*, 367 Fed. Appx. 679 (7th Cir. 2010) *cert*

*denied*, — U.S. —, 131 S.Ct. 343 (2010); *Smith v. Ozmint*, 396 Fed. Appx. 944 (4th Cir.

2010) (grooming policy least restrictive means to further compelling governmental interest);

*Fegans v. Norris*, 537 F.3d 897 (8th Cir. 2008) (hair length policies for  men do not violate

RLUIPA); *Hamilton v. Schriro,* 74 F.3d 1545, 1555, n. 12 (8th Cir. 1996) (collecting cases);

*Longoria v. Dretke*, 507 F.3d 898 (5th Cir. 2007) (prison system's hair length policies do not

violate RLUIPA).  *See generally  Smith v. Kyler*, 295 Fed. Appx. 479, 483 (3rd Cir. 2010)

("DOC has demonstrated that the restrictions [regarding paid chaplains to certain groups] are

the least restrictive means of advancing a compelling governmental interest."); *Gooden v.*

*Crain*, 353 Fed. Appx. 885 (5th Cir. 2009) (grooming regulations requiring inmates to be

clean shaven are least restrictive means of furthering compelling governmental interest in

security and do not violate RLUIPA); *Couch v. Jabe*, 5:10cv72 (W.D. Va. Apr. 21, 2011)

(same).

The plaintiffs argue that numerous other jurisdictions and the Federal Bureau of

Prisons permit long hair.[22]  The fact that other jurisdictions permit long hair is insufficient

---

[22] On April 8, 2011, the United States filed a Statement of Interest (doc. # 523) urging the court to require the defendants to "formulate a new policy that accounts for Defendants' obligations under RLUIPA." (Doc. # 523 at 2).  The court notes that the United States filed its Statement of Interest over two years after the evidentiary hearing, and almost a year after briefing was complete.  However, the United States simply

by itself to demonstrate that the ADOC's grooming policies are not the least restrictive means of furthering compelling governmental interests in this state.

> Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their own institutions than outside observers.

*Hamilton*, 74 F.3d at 1557 n. 15 (8th Cir. 1996); *Fegans*, 537 F.3d at 905.

The court must apply RLUIPA "in an appropriately balanced way, with particular sensitivity to security concerns." *Cutter*, 544 U.S. at 722. "Context matters" when determining whether the defendants have demonstrated that the hair length restrictions are the least restrictive means of further compelling governmental interests being "mindful of the urgency of discipline, order, safety, and security in penal institutions." *Id*. at 723. Here, the context is what occurs in Alabama's prisons, not prisons in other places. The court has carefully considered the evidentiary material, arguments and briefs of the parties, and finds that the ADOC's grooming regulations are the least restrictive means to further the compelling governmental interests in security and order in Alabama's overcrowded, understaffed and underfunded prisons.

In reaching this conclusion, the court is cognizant of its duty to accord "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with

---

regurgitates the plaintiffs' arguments, referencing the parties' briefs. Argument of counsel is of course not a substitute for evidence.

consideration of costs and limited resources." *Id.*  The court may not substitute its judgment for that of the prison officials.  *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 370-71 (6th Cir. 2005).  Accordingly, the court concludes, as a matter of law, that the ADOC's regulations restricting inmate hair length do not violate RLUIPA.

## IV. CONCLUSION

Based on the foregoing analysis, the RECOMMENDATION of the Magistrate Judge is as follows:

1.      That the Court find that the Alabama Department of Corrections' policies restricting inmate hair length does not violate the Religious Land Use and Institutionalized Persons Act of 2000.

2.      That the Court enter judgment in favor of the defendants and against the plaintiffs; and

3.      That the Court dismiss this action with prejudice.

It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before July 25, 2011.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 11th day of July, 2011.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE